IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN W. TARE, JR. | ) | CASE NO. 4:08 cv 2167 |
| | ) | |
| Plaintiff, | ) | JUDGE POLSTER |
| | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| v. | ) | |
| | ) | |
| MICHAEL J.ASTRUE, | ) | **REPORT AND RECOMMENDATION** |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule.  The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying John W. Tare Jr.'s application for Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court recommends the decision of the Commissioner be REVERSED and REMANDED to the Social Security Administration for further proceedings not inconsistent with this Report and Recommendation.

# I.  PROCEDURAL HISTORY

On April 12, 2004, Plaintiff filed an application for Disability Insurance benefits, alleging a disability onset date of June 21, 2002, due to limitations related to fibromyalgia and left side pain.

On June 29, 2007, Administrative Law Judge ("ALJ") Mark M. Carissimi determined Plaintiff had the residual functional capacity ("RFC") to perform light work with restrictions and, therefore, was not disabled (Tr. 19). On appeal, Plaintiff claims that the ALJ erred: (1) in rejecting the treating physicians' opinions; (2) in finding that Plaintiff does not meet Listing 1.04, without the benefit of a medical expert's testimony; (3) in finding Plaintiff not fully credible; and (4) in formulating Plaintiff's RFC[1].

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Born on November 3, 1957 (age 49 at the time of the ALJ's determination), Plaintiff is a "younger individual." *See* 20 C.F.R. §§404.1563, 416. 963.  Plaintiff completed high school and has past relevant work as a press operator and as a machine operator (Tr. 23).

### B.  Medical Evidence

On July 30, 2002, one month after Plaintiff's alleged onset date, an X-ray of Plaintiff's thoracic spine reveled a moderate amount of bone spur formation, especially between T8 and T12, and a probable old compression involving T8, T9 and T11, but no evidence of acute spinal compression (Tr. 128).

On August 13, 2002, Plaintiff complained to Dr. Bruce Willner, D.O., his family doctor, of left thorax pain and an inability to lift his left arm (Tr. 529). Dr. Willner prescribed Ultram, a pain medication (Tr. 529). On September 4, 2002, Dr. Alan Weiss, M.D., evaluated Plaintiff for complaints of pain in the left rib and waist area and diagnosed him with chronic chest wall and left

---

[1] Plaintiff appears to raise a fifth argument concerning the ALJ's failure to have a medical expert testify at the hearing. This argument, however, is essentially part of Plaintiff's Listing argument. Therefore, for ease of analysis, the Court combines these two arguments.

plank pain of unknown causation (Tr. 136-37). He prescribed Naprosyn and suggested costochondral[2] injections (Tr. 137). On October 16, 2002, Plaintiff reported excellent results from an injection and no pain while eating, but continued pain under his left arm (Tr. 135). On November 6, 2002, Dr. Weiss reported that a nerve block on Plaintiff's left thoracic spine provided good relief (Tr. 134).

On November 20, 2002, Plaintiff went to the emergency room complaining of left rib pain (Tr. 385). He was diagnosed with chest wall pain and prescribed Vicodin (Tr. 386). Two days later, Plaintiff went to the emergency room complaining of pain under both breasts. (Tr. 370). On November 26, 2002, Plaintiff reported to Dr. Willner that he felt better on Ultram, but still had pain and numbness in his left ribs (Tr. 554). On December 11, 2002, Dr. Willner opined that Plaintiff was unable to lift more than five pounds with his left arm and was unable to lift his left arm to ninety degrees (Tr. 439).

On January 22, 2003 Dr. Glenn Kolluri, a neurologist, examined Plaintiff and noted that he had decreased sensation and abnormal deep tendon reflexes on his left side (Tr. 186). Dr. Kolluri diagnosed Plaintiff with probable cervical myelopathy[3] and prescribed Neurontin for pain (Tr. 186). A January 31, 2003, nerve conduction study and needle examination showed left carpal tunnel syndrome and left middle and lower cervical motor radiculopathy[4] (Tr. 132).

A February 9, 2003, MRI revealed mild spurring at C3-4 and C4-5 on the right side; a moderate focal right disc protrusion and spurring in the right paracentral region of C3-4 responsible

---

[2] "Costochondral" is a term that means relating to the ribs and their cartilage.

[3] Cervical myelopathy is a disease of the spinal cord.

[4] Cervical motor radiculopathy is a nerve root impingement.

3

for significant stenosis of the right lateral recess and a slight impingement on part of the spinal cord on the right side; and moderate stenosis of the right lateral recess at C4-5 (Tr. 142). Dr. Kolluri opined that the MRI showed some spinal cord compression and narrowing of the right cervical spine, an he maintained his diagnosis of cervical myelopathy (Tr.183). Dr. Kolluri opined that Plaintiff should not work until March 31, 2003 (Tr. 183).

On April 9, 2003, Dr. Joel Siegal, a neurologist, examined Plaintiff and diagnosed him with cervical stenosis, left hemiparesis,[5] and cervical spondylosis (Tr. 164). He was uncertain whether Plaintiff's symptoms were attributable to stenosis because the majority of his stenosis was on the right while most of his symptoms were on the left (Tr. 164). He recommended a thoracic MRI and a cervical meylogram[6] (Tr. 164).

On April 15, 2003, a Somatosensory Evoked Response test of the median nerve revealed right and left median nerve present bilaterally with reduced amplitude and waveform morphology from C7 and reduced amplitude from the left somatosensory cortex when compared to the right (Tr. 130). On April 30, 2003 Plaintiff went to the Emergency room complaining that he was "blacking out" (Tr. 343).

On May 29, 2003, a meylogram revealed mild to moderate spondylotic changes from C2-3 through C5-6, including a moderate right lateral recess spur and disc protrusion at C3-4 that produced moderate compression on the right ventral spinal cord and narrowing of the right lateral recess (Tr.140-41). On June 4, 2003, Dr. Seigal opined that these tests revealed minor degenerative changes that did not explain Plaintiff's symptoms (Tr 339). He recommended a nerve block and

---

[5] Hemiparesis is weakness on one side of the body.

[6] A cervical meylogram is a type of X-ray.

physical therapy. (Tr.339).

On June 24, 2003, Dr. Ronald Yarab, a physical medicine/rehabilitation specialist, examined Plaintiff and noted, among other things, less sensation on Plaintiff's left side than on his right side and good muscular strength in his extremities (Tr. 172). Dr. Yarab diagnosed Plaintiff with left-sided extremity pain; cervical and lumbar degenerative joint and disc disease; and chronic pain syndrome (Tr. 172). He recommended physical therapy and exercise and prescribed Flexeril and Neurontin for pain (Tr. 173). Plaintiff attended twelve physical therapy sessions beginning  on July 3, 2003 (Tr. 146-59). He reported minimal improvement from physical therapy and medication and was discharged from therapy at his request (Tr. 146,167-68). Dr. Yarab opined that Plaintiff should not work from July 23, 2003 through August 7, 2003. (Tr. 169, 167).

On August 7, 2003, Dr. Yarab ordered a bone scan; the results were normal and Dr. Yarab instructed Plaintiff to increase his fitness level (Tr. 165, 423). Four days later, Dr. Willner reported that Plaintiff complained of pain in his left ribs and an inability to lift or use his left arm (Tr. 474). Dr. Willner opined that he was "still unemployable" (Tr. 474).

On August 13, 2003, Plaintiff reported to Dr. Siegal worsening left flank pain with radiation into the axial and down the arm into the hands and toes (Tr. 161). Dr. Siegal detected tenderness in the left flank region and noted that a nerve block did not help (Tr. 161).

On September 25, 2003, Dr. Jaimie Henderson, a neurosurgeon, examined Plaintiff and noted no real tenderness in the area about which Plaintiff complained (T6-T8); normal muscle tone and strength in his extremities; a decreased sensation to a pinprick at both sides of T6-T8, on his left side at C7 of his cervical spine, and in his left distal lower extremity; and a limited range of motion in his neck, but with a questionable level of effort (Tr.176-77). Dr. Henderson reviewed Plaintiff's

5

MRIs and noted that they showed no significant compression (Tr. 176-77). He opined that a neurological intervention was unnecessary, but suggested further testing (Tr. 176, 178).

On February 9, 2004, Dr. Mary Toth, a rheumatologist, examined Plaintiff (Tr. 280). Plaintiff complained of left arm and chest wall pain and weakness, but he had no symptoms on the right side of his body (Tr. 280). She opined that the right-sided disc protrusion at C3-4 with left-sided symptoms was puzzling (Tr. 280).

One month later, Plaintiff reported to Dr. Toth that there was no improvement with his left-sided weakness, pain, numbness, or spasms; that he had periods of confusion and persistent left chest wall pain; that he was not exercising regularly; that he had no side effects from his medications; and that he could do few activities of daily living (ADLs) (Tr. 272). Upon examining Plaintiff, Dr. Toth noted numerous trigger points, but there was no synovitis and an intact range of motion (Tr. 272). She diagnosed Plaintiff with left-sided weakness, a right-sided disc protrusion at C3-4 and compression of the nerve roots, and possibly panic attacks (Tr. 272). She added Relafen,[7] increased his dosage of Elavil, and continued Plaintiff's medication of Hyzmaar[8] and Tramadol (Tr. 272).

On April 22, 2004, Plaintiff complained to Dr. Willner of pain in the left side of his chest and an inability to lift his left arm (Tr. 450). Four days later, Plaintiff reported to Dr. Toth that he had no improvement with his myalgia or weakness and pain in his left side and that he was not exercising regularly except for some stretching (Tr. 269). Dr. Toth detected numerous trigger points; tenderness on the left side of Plaintiff's chest wall; an intact range of motion but pain in Plaintiff's left shoulder;

---

[7] Relafen is an anti-inflammatory.

[8] Hyzmaar is a medication for high blood pressure.

and weakness in Plaintiff's left extremities (Tr. 269). She added fibromyalgia and anxiety to her previous diagnosis, prescribed Celexa,[9] and opined that Plaintiff is unable to work (Tr. 269-70).

On June 2, 2004, Dr. Willner opined that Plaintiff would probably never work again due to pain, and that he was unable to lift his left arm or grip with his left hand (Tr. 296). Five days later, Plaintiff reported to Dr. Toth that he had no improvement in his fibromyalgia or left-sided pain and weakness and that he had periods of sharp pain in his right foot (Tr. 264). He also reported that he was not exercising regularly; that Tramadol helped with his pain; and that he could do few ADLs (Tr. 264). Dr. Toth detected numerous trigger points; improved strength in Plaintiff's left foot; and an intact range of motion (Tr. 264). To her previous diagnoses she added osteoarthritis of the cervical spine with a herniated disc to the right of C3-4 and adjusted Plaintiff's medications (Tr. 265).

On June 25, 2004, Dr. Toth opined that Plaintiff suffered from osteoarthritis, cervical radiculopathy, fibromyalgia, left-sided weakness, anxiety, and panic attacks; had weakness, depressed reflexes, and tenderness in his extremities; had no issue of compliance that interfered with his treatment; and had a poor response to therapy (Tr. 266-268).

On August 2, 2004, Dr. Edmond Gardener, M.D., completed a physical residual functional capacity assessment, in which he opined that Plaintiff had the ability to lift fifty pounds occasionally and twenty five pounds frequently; Plaintiff could sit, stand, or walk for six hours in an eight hour day; Plaintiff was unlimited in his ability to push or pull; and that the severity of Plaintiff's symptoms was disproportionate to the medical evidence (Tr. 209, 212). He further noted that lack of effort appeared to be a strong consideration, and that such an assessment was supported by the absence of atrophy and significant neurological loss (Tr 210). On November 29, 2004, a second

---

[9] Celexa is an anti-depressant.

physician reviewed Plaintiff's file and affirmed Dr. Gardner's opinion (Tr. 213).

On August 24, 2004, Dr. Willner noted that Plaintiff was unable to lift his left arm (Tr. 573). two weeks later, Plaintiff reported to Dr. Toth that he noticed improvement in his fibromyalgia, but he had headaches as well as pain on the left side of his body and in his right foot (Tr. 261). He was stretching regularly, walking some, and could do most ADLs (Tr. 261).

On October 29, 2004, Dr. Willner reported to the state Bureau of Disability Determination that Plaintiff had no new complaints since his last report and that his right side was "unremarkable" (Tr. 294). Two weeks later, Dr. Toth opined that Plaintiff suffered from fibromyalgia, left-sided weakness, and cervical disc disease; had no issues of compliance; was unable to work; and had some difficulty in self care (Tr. 255-57).

On December 7, 2004, Plaintiff reported to Dr. Toth that he had seen a little improvement in his fibromyalgia, although pain persisted; was not exercising regularly; and could do some ADLs (Tr. 252). Dr. Toth detected, among other things, numerous trigger points; discomfort on range of motion of the shoulders; and an intact range of motion (Tr. 252). She added Cymbalta[10] to Plaintiff's medications (Tr. 252). Three weeks later, Dr. Willner reported that Plaintiff's pain was less severe, but he could not lift his left or right arm (Tr. 454).

On March 11, 2005, Plaintiff reported to Dr. Toth that he had some improvement in his fibromyalgia; was not exercising regularly; and could do some ADLs, but could not do things with his arms raised above his head and tended to drop things from his left hand (Tr. 247). Dr. Toth opined that Plaintiff should avoid lifting over five pounds (Tr. 247).

On April 22, 2005, Dr. Willner opined that Plaintiff could work no more than three to five

---

[10] Cymbalta was prescribed for Plaintiff's fibromyalgia and anxiety.

cumulative hours in a weekday; could no more than occasionally carry or lift up to ten pounds; could sit no more than six hours; was limited in the use of his extremities due to pain on his left side; could never climb, stoop, kneel, crouch, or crawl; and was limited in his ability to reach and handle (Tr. 292-93). Throughout the remainder of 2005, Plaintiff complained to Dr. Willner of neuropathic pain; pain in the left side of his chest, left leg and left arm; restless leg; balance problems; and numbness in his left hand and foot (Tr. 456-57).

On July 19, 2005, Plaintiff reported to Dr. Toth that his fibromyalgia had improved; that pain persisted in his chest, shoulders, and arms, with worse pain on his left side; that numbness in his right arm had increased; and that he had trouble with balance, worse on his left side (Tr. 309). Plaintiff reported that he was exercising regularly and could do some ADLs (Tr. 309). Dr. Toth reported numerous trigger points; an intact range of motion; and reflexes at 2/4 in Plaintiff's biceps, forearm, knees, and ankles (Tr. 309). She added chronic pain to her previous diagnoses; did not change Plaintiff's medications; and stressed the importance of regular exercise (Tr. 309).

On November 11, 2005, Plaintiff reported that his fibromyalgia had improved and that the pain on his left side had improved, but had worsened on his right; that he exercised regularly with stretch bands; and that he could do some ADLs (Tr. 308). Dr. Toth detected numerous trigger points; full range of motion in the joints; limited range of motion in the lumbar and cervical spine; and positive leg rests on the left (Tr. 308). She opined that Plaintiff was unable to work; did not change his medications; and stressed the importance of exercise and sleep (Tr. 308).

On February 18, 2006, Plaintiff went to the emergency room and complained of right shoulder pain (Tr. 594). A diagnostic image of the shoulder was negative, and an image of the cervical spine showed mild degenerative disc disease at C6-7 (Tr. 601-02).

On February 27, 2006, Plaintiff reported that he had no improvement in his fibromyalgia and recently had pain in his right shoulder and arm; had not exercised regularly because he was unable; and could do some ADLs (Tr. 305). Dr. Toth detected numerous trigger points; a full range of motion in the joints; an intact range of motion with pain and tenderness in the right shoulder; and tenderness over the lateral chest wall (Tr. 305). She added right shoulder strain/impingement syndrome to her previous diagnoses and opined that the pain on Plaintiff's right side might be due to his herniated disc (Tr. 305). She did not change his medication, gave him exercises to do, and stressed the importance of exercise and sleep (Tr. 306). On March 1, 2006, Plaintiff went to the emergency room complaining of pain in his right shoulder (Tr. 605).

On March 16, 2006, Dr. Michael Miladore, M.D., examined Plaintiff and noted a full range of motion, but weakness in his upper extremities (Tr. 303). He opined that Plaintiff's right shoulder pain was possibly due to his fibromyalgia or his right shoulder impingement (Tr. 303). Plaintiff reported some relief from an injection, but complained of numbness in his right hand (Tr. 303). Dr. Miladore recommended an exercise program (Tr. 304).

On May 1, 2006 Plaintiff reported that he had no improvement in his fibromyalgia; that pain persisted in his neck, shoulders, and chest; that he used Ultram for his fibromyalgia, but it did not relieve his right shoulder and neck pain; that shots in his shoulder had helped minimally; that he had not regularly exercised; and that he could do few ADLs (Tr. 301). Dr. Toth detected numerous trigger points; full range of motion in the joints; an intact range of motion with pain and tenderness in the right shoulder; and tenderness in the lateral chest wall (Tr. 301). She did not change the plaintiff's medications and stressed the importance of exercise and sleep (Tr. 301).

On August 7, 2006, Dr Willner reported decreased strength in Plaintiff's left arm and an

ability to do minimal activity (Tr. 459). On January 9, 2007, Dr. Willner reported that Plaintiff has tender points in his ribs and could not lift his arm or use his right shoulder (Tr. 686).

### C. Hearing Testimony

### 1. Plaintiff's Testimony

Plaintiff testified that he feels pain from his neck to his toes (Tr. 699). He feels numbness from the base of his neck down to his shoulders and into his fingers; he indicated that the left side is worse than the right (Tr. 699). He is unable to stand very long, unable to lift more than five pounds, and unable to lift at all with his left hand (Tr. 699).

Plaintiff got up and down a lot during the hearing; he explained that it was because he was unable to sit because of the pain (Tr. 700-01). He testified that he can stand two to three minutes at the most because his knees get wobbly and his feet are numb (Tr. 702).  He can sit, at most, for three to four minutes until the pain starts bothering him (Tr. 703). He cannot walk very far because he must sit down and rest and because his legs give out on him (Tr. 703). He is unable to lean forward and has problems gripping and holding things with his left hand (Tr. 701, 702). He stated that his pain occasionally rates a seven or eight on a scale of zero to ten (Tr. 699).

Plaintiff testified that he takes multiple pain medications. The medications cause dizziness, fainting, and difficulty with his memory (Tr. 700). Plaintiff further testified that he dresses himself, but it is difficult and it takes him a long time (Tr. 704-05). He lives with his wife who does most of the household chores (Tr. 704). He watches television, reads newspapers and visits with family who stop in (Tr. 705, 709). He drives short distances and goes shopping with his wife (Tr. 709). He can heat up  meals, but it takes him a long time (Tr. 704). He sleeps no more than four to six hours a night because of the  pain, but he naps during the day (Tr. 705). He testified that Dr. Toth gave him

11

exercises to do three times a day if possible and that he tried to do them twice a day (Tr. 708).

## 2. Vocational Expert Testimony

Ted Macy testified as a vocational expert ("VE") at Plaintiff's hearing. The ALJ asked the VE whether a person with Plaintiff's vocational background who is able to lift and carry twenty pounds occasionally and ten pounds frequently; able to stand and/or walk for six hours out of an eight hour day; able to sit for at least six hours of an eight hour day; able to push or pull up to twenty pounds occasionally and ten pounds frequently; restricted from climbing ladders, ropes, or scaffolds; and limited to no more than frequent overhead reaching could perform any of Plaintiff's past relevant work (Tr. 717). The VE testified that such a person could not. (Tr. 717). However, the VE identified a substantial number of other jobs in the national economy that such a person could perform (Tr. 718). Those jobs include: (1) bench assembler, with 1,000 jobs in Northeast Ohio and 200,000 nationally; (2) wire worker, with 1,200 jobs in Northeast Ohio and 195,000 nationally; and (3) cashier with 2,000 jobs in Northeast Ohio and 300,000 nationally (Tr. 718).

The ALJ then asked the VE to consider an individual able to lift and carry ten pounds occasionally and lesser weights more frequently; able to sit for less than six hours out of an eight hour day; able to stand and walk for two hours out of an eight hour day; able to push or pull up to ten pounds occasionally and lesser weights more frequently; but only able to sustain work for five hours out of an eight hour day. (Tr. 719). The VE responded that such a person would be removed from competitive employment (Tr. 719).

## III.  DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance benefits only when he establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423.  A claimant is

considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20. C.F.R. §§ 404.1505.

## IV.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 Fed. Appx. 361, 362 (6th Cir. June 15, 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed.  *Id.* Indeed, the Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

13

# V. ANALYSIS

## A. The ALJ's Determination That Plaintiff Does not meet Listing § 1.04

Plaintiff argues that in determining that Plaintiff does not meet Listing § 1.04, the ALJ interpreted medical evidence without consulting a medical expert. Listing § 1.04 requires evidence of:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. § 404, Subpt. P, Appendix 1, § 1.04. The ALJ found that there was no evidence of motor loss or sensory or reflex loss associated with Plaintiff's nerve root compression (Tr. 19). The ALJ explained that Plaintiff's motor and sensory loss on his left side was not attributable to the nerve root compression, which was mostly on his right. Plaintiff argues that this is a medical conclusion that the ALJ should not have made without consulting a medical expert.

The use of a medical expert is not mandatory unless the evaluation and interpretation of background medical test data is required or unless the use of a medical expert is ordered by the Appeals Council or a court. *See* HALLEX I-2-5-34. The ALJ did not engage in his own interpretation of medical data. The ALJ relied on the opinions of Dr. Henderson and Dr. Toth who were puzzled by the distribution of the pain and symptoms and were hesitant to attribute Plaintiff's left-sided symptoms to his right-sided compression (Tr. 19). Therefore, substantial evidence supports the ALJ's determination that Plaintiff is unable to meet his burden of showing that he exhibits all of the elements of the listing.

14

Plaintiff claims that the ALJ failed to provide adequate reasons for rejecting the listing. However, the ALJ explained that Plaintiff does not meet the listing because there was no evidence of motor loss or sensory or reflex loss associated with the nerve root compression (Tr. 19). To meet a listed impairment, a claimant must satisfy all of the criteria in the listing. *See Roby v. Comm'r of Soc. Sec.*, 48 Fed. Appx. 532, 536 (6th Cir. 2002) (citing *Hale v. Secretary of Health & Human Servs.*, 816 F.2d 1078, 1083 (6th Cir. 1987)). The ALJ's finding that Plaintiff did not exhibit one of the elements is, therefore, a sufficient explanation for the ALJ's determination that Plaintiff did not meet the listing.

## B. The ALJ's Credibility Determination

Plaintiff argues that the ALJ erred in finding him not fully credible. The ALJ does not need to fully credit a subjective complaint where there is no underlying medical basis. *Hare v. Comm'r of Soc. Sec.*, 37 Fed. Appx. 773, 775 (6th Cir. 2002) (citing *Fraley v. Secretary of Health & Human Servs.*, 733 F.2d 437, 440 (6th Cir. 1984)). However, because objective medical evidence may not always reflect the severity of limitations caused by pain, an ALJ must consider a claimant's statements about pain and reach a conclusion about the credibility of those statements. *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 960 (N.D. Ohio 2003). "This consideration takes on paramount importance in a fibromyalgia case because the symptoms of that impairment are entirely subjective." *Id.* The Court finds that remand is required because it is unclear if the ALJ properly assessed Plaintiff's credibility in light of the unique nature of fibromyalgia.

Plaintiff's argument focuses on the ALJ's determination that Plaintiff was not compliant with his doctors' recommendations for exercise. The ALJ determined that Plaintiff was non-compliant based on notes from Dr. Toth that stated that Plaintiff was not exercising and used that conclusion

15

as part of his adverse credibility determination. Plaintiff argues that Dr. Toth's notes indicate that Plaintiff did not exercise because he was unable to do so.

Plaintiff's claim focuses on particular statements from Dr. Toth. Dr. Toth's individual statements, however, are ambiguous and it is, therefore, unclear whether Plaintiff's failure to exercise was because he was unable to do so or because he simply was not compliant. The record contains the following relevant information:

**08/22/2003:** Dr. Yarab advises Plaintiff that he needs to increase his activity and fitness level. (Tr. 165)

**03/08/2004:** Dr. Toth notes that Plaintiff has not seen an improvement in his condition. Plaintiff is not exercising on a regular basis. (Tr. 272)

**04/26/2004:** Dr. Toth notes that Plaintiff has not seen an improvement. Plaintiff is not exercising on a regular basis except for some stretching.(Tr. 269)

**05/25/2004:** Dr. Toth reports that there were no issues of compliance that interfere with treatment. (Tr. 268)

**06/07/2004:** Dr. Toth notes that Plaintiff has not seen an improvement. Plaintiff is not exercising on a regular basis. (Tr. 264)

**09/07/2004:** Dr. Toth notes that Plaintiff has seen an improvement in the fibromyalgia. Plaintiff is doing stretching exercises on a regular basis with some walking. (Tr. 261)

**11/12/2004:** Dr. Toth reports that there were no issues of compliance that interfere with treatment. (Tr. 257)

**12/07/2004:** Dr. Toth notes that Plaintiff has seen a small improvement in the fibromyalgia. Plaintiff is not exercising. (Tr. 252)

**03/11/2005:** Dr. Toth notes that Plaintiff has seen some improvement. Plaintiff is not exercising on a regular basis. (Tr. 247)

**07/19/2005:** Dr. Toth notes that Plaintiff has seen an improvement. Plaintiff is exercising on a regular basis. Dr. Toth stresses the importance of regular exercise. (Tr. 631)

**11/11/2005:** Dr. Toth notes that Plaintiff has seen an improvement. Plaintiff is exercising on a regular basis. Dr. Toth stresses the importance of regular exercise.(Tr. 626)

**02/27/2006:** Dr. Toth notes that Plaintiff has not seen an improvement in the fibromyalgia. Plaintiff is not exercising on a regular basis because he is not able. Dr. Toth gave Plaintiff some exercise to do and stresses the importance of regular exercise. (Tr. 305)

**05/01/2006:** Dr. Toth notes that Plaintiff has not seen an improvement. Plaintiff is not exercising on a regular basis. Dr. Toth stresses the importance of regular exercise.

16

(Tr. 301).

Dr. Toth noted on many occasions that Plaintiff was not exercising but remarked only once, in February 2006, that it was because he was unable. This may suggest that at the other times Plaintiff was able. Yet, at the following visit Dr. Toth notes that there was no improvement and that Plaintiff was not exercising, but she does not state that it was because he was unable. This may suggest that Plaintiff's failure to exercise was because he was unable, even when Dr. Toth neglected to specify so. On the other hand, at the very same visit at which Dr. Toth noted that Plaintiff was unable to exercise, she gave him exercises to do and encouraged him to exercise. This may suggest that Dr. Toth had not in fact determined that Plaintiff was unable to exercise, but that she merely was recording Plaintiff's assertion that he was not exercising because he was unable. Additionally, on two occasions Dr. Toth reported that there were no compliance issues. One of those reports was following a visit at which she noted that Plaintiff was not exercising. Accordingly, Dr. Toth's individual statements appear to shed little light on the reasons for Plaintiff's failure to exercise — i.e., whether his failure was due to his inability or simple unwillingness to comply with the recommendations. Importantly, the ALJ did not inquire into the reasons for Plaintiff's failure to exercise; he merely concluded that the fact that Plaintiff did not exercise was evidence of Plaintiff's unwillingness to comply and used that finding to support his adverse credibility determination.

Moreover, the Sixth Circuit has found that testimony that the best treatment for fibromyalgia is regular exercise is of limited significance in determining the nature of a claimants functional limitations. *See Rogers v. Comm'r of Soc.* Sec., 486 F.3d 234, 249 (6th Cir. 2007). "The fact that a patient is encouraged to remain active does not reflect the manner in which such activities may aggravate the patients symptoms." *Id.* The ALJ considered the fact that Plaintiff's physicians

encouraged him to exercise as evidence that Plaintiff was capable of greater activity (Tr. 22). Given the limited relevance of doctors' recommendations to exercise in determining what a Plaintiff can and cannot do under *Rogers*, Plaintiff's failure on some occasions to comply with those recommendations — without more of an inquiry into the reasons for those failures — may also be of questionable significance for purposes weighing Plaintiff's credibility.

The ALJ did not base his credibility on this factor alone, however. The ALJ also considered the objective medical evidence as well as some of the factors listed in S.S.R. 96-7p and 20 C.F.R. § 404.1520 which set forth certain criteria for an ALJ to consider in making credibility determinations, such as the individual's daily activities; the frequency and intensity of the individual's pain or other symptoms; any medication the individual takes or has taken to alleviate pain or other symptoms; and treatment, other than medication, the individual receives or has received for relief of pain or other symptoms. The Court addresses below each of the additional factors the ALJ considered.

The ALJ considered Plaintiff's daily activities and found that Plaintiff's statements with respect to his activities were inconsistent. Plaintiff alleged that he is only able to engage in minimal daily activities; however, in December 2004, Plaintiff reported that he is able to wash dishes, do some household cleaning, drive short distances, and shop. The ALJ found these activities to be inconsistent with Plaintiff's statements that his activities are minimal. (Tr. 22). The ALJ's characterization here is somewhat overstated. Even if the ALJ is correct that Plaintiff's reported activities were more than "minimal," they are clearly not significantly more than minimal. Thus, this reason appears to be of questionable significance.

The ALJ also noted that there was no evidence that Plaintiff's use of prescribed medication causes any side effects that would interfere with his ability to work (Tr. 22). The ALJ correctly

considered this factor, as it is one of the factors listed in S.S.R. 96-7p. The ALJ does not, however, elaborate as to how this detracts from Plaintiff's credibility.

The ALJ also considered the objective medical evidence and noted that Plaintiff has full strength in his upper and lower extremities and a full range of motion (Tr. 22). In considering these factors the ALJ appears to have ignored the unique nature of Plaintiff's condition, even though he concluded that Plaintiff suffers from degenerative disc disease of the cervical spine and fibromyalgia (Tr. 18). Fibromyalgia is an "elusive" and "mysterious" disease that produces no objectively alarming signs. It has no known cause or cure and there is no clinical or laboratory test to determine its existence or severity. *Rogers*, 486 F.3d at 243; *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003). Fibromyalgia patients manifest normal muscle strength and have a full range of motion. *Rogers*, 486 F.3d at 244. Accordingly, "objective tests are of little relevance in determining the existence or severity of fibromyalgia." *Id.* at 243 (*citing Preston v. Secretary of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1998)).

Because fibromyalgia is not subject to verification by objective testing, the severity of fibromyalgia is confirmed by identifying focal tender points and by observing other classic symptoms of fibromyalgia. *See Preston v. Secretary of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1998). The ALJ did not mention this standard and made no reference to the fact that Dr. Toth, on many occasions, found numerous trigger points. (Tr. 247, 252, 261, 264, 269, 272, 301, 305, 626, 631). Instead, the ALJ focused on the lack of objective findings.

Although it is not improper to consider objective evidence in fibromyalgia cases, an over-emphasis on objective evidence is inappropriate, particularly in the context of a credibility

19

determination. *See Rogers*, 486 F.3d  at 248. It is unclear how much the ALJ relied upon the objective evidence, the purported inconsistency between Plaintiff's activities and a "minimal" activity level, and Plaintiff's somewhat inconsistent adherence to his exercise program — a factor which, as noted above, also may be of questionable significance in fibromyalgia cases — in assessing Plaintiff's credibility. While an ALJ's credibility determination is entitled to great deference, *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001), the ALJ made no reference to the unusual nature of fibromyalgia, and it is unclear if he assessed Plaintiff's credibility in light of the proper standard for fibromyalgia cases. The Court, therefore, finds that remand is necessary in order to determine Plaintiff's credibility in consideration of the appropriate standard for fibromyalgia cases.

### C. The ALJ's Treatment of Treating Physicians Opinions.

Plaintiff argues that the ALJ erred in assigning only little weight to the opinions of Dr. Willner and Dr. Toth, Plaintiff's treating physicians.

The opinions of treating physicians are afforded greater weight than those of physicians who have examined the claimant on consultation or who have not examined the claimant at all.  *See Meece v. Barnhard*, 192 Fed. Appx. 456, 460 (6th Cir. 2006); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980). However, even if a physician is classified as a treating physician, his opinion may be afforded little weight if the plaintiff fails to show his impairments are supported by contemporaneous, objective clinical or diagnostic findings.  *See Sullenger v. Comm'r of Soc. Sec.*, 255 Fed. Appx. 988, 993 (6th Cir. 2007) (citing *Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Despite the elusive nature of fibromyalgia, Plaintiff retains the burden of producing evidence

20

other than his subjective complaints to support his claim of disability. *See Cohen v. Secretary of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). A diagnosis of fibromyalgia does not automatically entitle a claimant to disability benefits. *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008). "Some people may have a severe case of fibromyalgia as to be totally disabled from working . . . but most do not." *Id.* (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

The ALJ found that Dr. Willner did not provide objective evidence to support his proposed limitations and that Dr. Toth did not provide a basis for her proposed limitation (Tr. 21). While it was appropriate for the ALJ to require evidence that supported the proposed limitations, the ALJ focused on objective tests and neglected to look for evidence of medically accepted signs of fibromyalgia, such as evidence of tenderness in the appropriate focal points. The ALJ made no mention of the fact that Dr. Toth, on many occasions, found numerous trigger points. (Tr. 247, 252, 261, 264, 269, 272, 301, 305, 626, 631); *See Swain*, 297 F. Supp. 2d at 993 (holding that ALJ's rejection of treating physician's opinion was not supported by substantial evidence, in part, because ALJ did not discuss physician's finding that the plaintiff exhibited tenderness in appropriate focal points).

The ALJ stated that Dr. Willner's and Dr. Toth's opinions were inconsistent with the evidence as a whole (Tr. 21). The ALJ does not elaborate further on this point; however, a reading of the ALJ's opinion as a whole suggests that he is referring to Plaintiff's normal muscle strength and full range of motion– evidence that he mentions later in the opinion in conjunction with his credibility assessment. As discussed above, findings of normal muscle strength and range of motion are typical in fibromyalgia patients. Additionally, the ALJ explained that Dr. Willner's opinion is inconsistent with other physicians' recommendation for Plaintiff to exercise (Tr. 21). As previously discussed,

such recommendations are of limited significance. *See Rogers*, 486 F.3d at 249 (holding that treating physicians' recommendations that the plaintiff should remain as active as possible was not inconsistent with functional limitations and work restrictions).

Most importantly, the ALJ found that Dr. Willner's opinion appeared to be based on Plaintiff's subjective complaints (Tr. 21). Because fibromyalgia is not susceptible to objective verification, a physician's opinion must necessarily depend on an assessment of a patient's subjective complaints. *Swain*, 297 F. Supp. 2d.at 990. This feature of fibromyalgia places a premium on the assessment of Plaintiff's credibility. *See Id.* Because the ALJ may have erred in his credibility determination, his determination with respect to the treating physicians' opinions should be reassessed upon remand as well.

### D. The ALJ's RFC Determination

Plaintiff argues that the RFC that the ALJ used in the hypothetical question posed to the VE was not supported by substantial evidence because the ALJ did not include the limitations imposed by Plaintiff's treating physicians. In making this argument Plaintiff relies on *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235 (6th Cir. 2002). Plaintiff understands *Howard* to hold that a VE's answer to a hypothetical question is not substantial evidence where the question does not contain restrictions imposed by treating physicians. *Howard*, however, contains no such general rule. In *Howard*, the court determined that the ALJ had erred by disregarding the treating physician's uncontradicted opinion. *Id.* at 240. Consequently, the court found that the hypothetical question, which did not include the treating physician's limitations, was inaccurate. *Id.* at 241. A hypothetical question is only required to include restrictions which the ALJ finds to be credible. *Casey v. Secretary of Health &*

*Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Nevertheless, because the ALJ may have erred in assigning the treating physicians' opinions less weight, the hypothetical question may have been inaccurate as well. The Court, therefore, finds that remand is necessary.

## VI.  DECISION

For the foregoing reasons, the Magistrate Judge finds the decision of the Commissioner that Plaintiff was not disabled is not supported by substantial evidence.  Accordingly, the Court recommends the decision of the Commissioner be REVERSED and REMANDED to the Social Security Administration for further proceedings not inconsistent with this Report and Recommendation.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: July 6, 2009.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).